UNITED STATES DISTRICT COURT

DISTRICT OF MARYLAND

| | |
|---|---|
| CYNTHIA WOOLDRIDGE<br>9000 Lindale Drive<br>Bethesda, MD 20817<br>Montgomery County,<br>Individually and on Behalf of All Others Similarly<br>Situated, | ) No. _____<br>)<br>)<br>)<br>)<br>) CLASS ACTION COMPLAINT<br>) |
| Plaintiff, | )<br>) |
| vs. | )<br>) |
| FIRST POTOMAC REALTY TRUST<br>7600 Wisconsin Avenue, 11th Floor<br>Bethesda, MD 20814<br>Montgomery County<br>    Serve On:<br>    CSC-Lawyers Incorporating Service Company<br>    7 St. Paul Street, Suite 820<br>    Baltimore, MD 21202, | )<br>)<br>)<br>)<br>)<br>) <u>JURY TRIAL DEMAND</u><br>)<br>) |
| ROBERT H. ARNOLD<br>129 East 69th Street, Apt. 7B-E<br>New York, NY 10021, | )<br>)<br>) |
| JAMES P. HOFFMAN<br>60 Maugus Avenue<br>Wellesley, MA 02481, | )<br>)<br>) |
| ROBERT MILKOVICH<br>5125 Westpath Way<br>Bethesda, MD 20816<br>Montgomery County, | )<br>)<br>)<br>) |
| KATI PENNEY<br>5602 Durbin Road<br>Bethesda, MD 20814<br>Montgomery County, | )<br>)<br>)<br>) |

[Caption continued on following page.]

- 1 -

THOMAS E. ROBINSON
21 West Hughes Street
Baltimore, MD 21230
Baltimore City,

TERRY L. STEVENS
5316 Gran Gate Drive
Raleigh, NC 27613,

              Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

Plaintiff, by the undersigned attorneys, individually and on behalf of all others similarly situated, respectfully brings this class action for violations of §§14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder, against the herein named defendants and alleges the following:

## SUMMARY OF THE ACTION

1.      This is a stockholder class action brought on behalf of the holders of First Potomac Realty Trust ("FPO" or the "Company") common stock against FPO and its Board of Trustees (the "Board").  This matter arises out of defendants' dissemination of a misleading proxy statement in connection with the proposed sale of the Company to a subsidiary of Government Properties Income Trust ("GOV") (the "Acquisition" or "Merger").

2.      FPO is a self-administered, self-managed real estate investment trust that focuses on owning, operating, developing and redeveloping office and business park properties in the greater Washington, D.C. region.  GOV is a real estate investment trust that focuses on properties that are leased to government tenants.

3.      On June 28, 2017, FPO announced the definitive merger agreement (the "Merger Agreement") under which FPO would be acquired by GOV for just $11.15 per share.

4.      The $11.15 per share is an inadequate price for the Company's shares.  When the Company's Chief Executive Officer ("CEO"), defendant Robert Milkovich ("Milkovich") took the helm of the Company in November 2015, the Company's stock price was at $11.60 per share.  The $11.15 per share Merger price contradicts the Company's recent performance and is inconsistent with management's stated expectations for the Company's financial future.  The $11.15 per share Merger price is below the Company's June 27, 2017 closing price of $11.35 per share, and below analysts' consensus net asset value ("NAV") of $11.37 per share.

5.      On August 24, 2017, defendants issued a materially misleading Definitive Proxy Statement on Schedule 14A (the "Proxy"), telling the Company's shareholders to accept the $11.15 per share offer and vote in favor of the Merger.

6.      In the Proxy, defendants stated that the Company's financial advisor Wells Fargo Securities, LLC ("Wells Fargo") had performed a NAV analysis purportedly supporting an opinion that the Merger consideration is financially fair to the Company's shareholders.  The Proxy discloses the results of Wells Fargo's NAV analysis but omits the key component of the analysis – the capitalization rates ("cap rates") assumed in the analysis.  In a NAV analysis, the choice of cap rates is the most important input in the model.  The higher the cap rate, the lower the valuation that is being assigned to the real estate.

7.      As detailed below, this material omission prevented the Company's public shareholders from appreciating the fact that Wells Fargo's NAV analysis was flawed for using an unreasonably high cap rate, and misled the Company's shareholders into trusting that the Board's

recommendation of the Merger was supported by a valid valuation of their shares. This material omission induced FPO's shareholders to rely on Wells Fargo's NAV analysis and the Board's recommendation, and accept an offer that was unfair compared to the actual intrinsic value of the Company.

8.      By the actions alleged herein, defendants are violating §§14(a) and 20(a) of the 1934 Act.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over the claims asserted herein pursuant to §27 of the 1934 Act for the violations of §§14(a) and 20(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.

10.      This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

11.      Venue is proper in this District pursuant to 28 U.S.C. §1391, because FPO's headquarters are located 7600 Wisconsin Avenue, 11th Floor, Bethesda, Maryland 20814, and defendants include an officer and/or director who resides in Maryland.

## PARTIES

12.      Plaintiff Cynthia Wooldridge is, and has been at relevant times hereto, a shareholder of FPO.

13.      Defendant FPO is a Maryland corporation headquartered in Bethesda, Maryland.

14.     Defendant Robert H. Arnold ("Arnold") is, and has been at relevant times hereto, a member of the Board.  Arnold has served as a member of the Board since the Company's initial public offering in 2003.

15.     Defendant James P. Hoffman ("Hoffman") is, and has been at relevant times hereto, a member of the Board.  Hoffmann has served as a member of the Board since 2015.

16.     Defendant Robert Milkovich is, and has been at relevant times hereto, the Company's CEO, Chief Operating Officer ("COO"), and a member of the Board.  Milkovich has served as the COO since June 2014 and CEO and member of the board since November 2015.

17.     Defendant Kati Penney ("Penney") is, and has been at relevant times hereto, a member of the Board.  Penney has served as a member of the Board since October 2016.

18.     Defendant Thomas E. Robinson ("Robinson") is, and has been at relevant times hereto, a member of the Board.  Robinson has served as a member of the Board since 2013.

19.     Defendant Terry L. Stevens ("Stevens") is, and has been at relevant times hereto, the Chairman of the Board.  Stevens has served as a member of the Board since 2003.

20.     The defendants named above in ¶¶14-19 are sometimes collectively referred to herein as the "Individual Defendants."

## CLASS ACTION ALLEGATIONS

21.     Plaintiff brings this action individually and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of holders of FPO common stock who are being and will be harmed by defendants' actions described below (the "Class").  Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendants.

22.     This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23.

23.     The Class is so numerous that joinder of all members is impracticable.  According to the Proxy, as of August 21, 2017, there were approximately 58,740,535 shares of FPO common stock outstanding.

24.     There are questions of law and fact that are common to the Class and that predominate over questions affecting any individual Class member.  The common questions include, *inter alia*, the following:

(a)     whether defendants have disseminated a misleading proxy statement in violation of §§14(a) and 20(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder; and

(b)     whether misstatements in and/or omissions from the Proxy are causing injury to plaintiff and the Class.

25.     Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff does not have any interests adverse to the Class.

26.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

27.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

28.     Plaintiff anticipates that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

29.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## THE ACQUISITION

**Background**

30.     FPO was formed as a Maryland trust in 2003.  FPO completed its initial public offering in October 2003.  By the end of 2003, FPO owned properties totaling 2.9 million square feet and had total assets of $244.1 million.

31.     By the beginning of 2010, FPO grew its portfolio to over 12 million square feet and owned total assets of $1.1 billion.  In 2010, FPO entered the office market in Washington, D.C. with the acquisition of four office properties, including one property purchased through an unconsolidated joint venture, and thereafter continued its focus on acquiring office properties.

32.     At March 31, 2017, FPO's portfolio consisted of 71 buildings totaling 6.0 million square feet, and FPO owned total assets of $1.2 billion:



**The Company's Successful Execution of its Strategic Plan**

33.     In 2013, FPO updated its strategic and capital plan, which, among other things, included a capital recycling strategy to divest of lower quality assets.  During 2013, FPO sold the majority of its industrial portfolio and decided to strategically focus on office properties and business parks.

34.     On July 30, 2015, the Company announced financial results for the three and six months ended June 30, 2015, including increased Same-Property NOI by 5.2% on an accrual basis and 7.0% on a cash basis compared with the same period in 2014.[1]  In the press release announcing

---

[1]     "Same-Property NOI" refers to Same Property Net Operating Income, defined as operating revenues (rental, tenant reimbursements and other revenues) less operating expenses (property operating expenses, real estate taxes and insurance) from the properties whose period-over-period operations can be viewed on a comparative basis (*i.e.*, those consolidated properties owned and in-

the results, the Company also announced that it would "immediately implement a plan designed to improve performance and create shareholder value by commencing a process to accelerate the sale of at least $200 million of assets."

35.     "We had a strong quarter from both an operational and financial perspective, and I am pleased with our results.  We delivered strong same-property NOI growth and increased our occupancy to the highest level we have achieved since the first quarter of 2006," stated Douglas J. Donatelli ("Donatelli"), then-CEO of PTO.  "[i]n addition, I firmly believe that accelerating the monetization of selective assets and redeploying those proceeds back into the Company represents a more compelling investment opportunity, on a risk-adjusted basis, compared to the acquisition of real estate assets in our market, and provides the best path to maximizing shareholder value."

36.     In the July 31, 2015 earnings call, Donatelli further stated:

We achieved solid same property NOI growth, further increased our occupancy, and continued to actively manage our long-term lease expirations.  We reported core FFO of $0.25 a share driven by strong same property growth and occupancy increases across our portfolio.  During the second quarter, we signed 92,000 square feet of new leases and 105,000 square feet of renewal leases.  Our portfolio remains 91% leased and our occupancy increased to 89.1%, which is the highest level of occupancy we have achieved since the first quarter of 2006.  We also increased our same property NOI by 5.2% on a GAAP basis, bringing our same property NOI growth to 4.2% for the first half of the year, which allowed us to raise the bottom end of our guidance range.

37.     On October 29, 2015, the Company announced financial results for the three and six months ended September 30, 2015, including increased Same-Property NOI by 3.1% on an accrual basis and 5.2% on a cash basis compared with the same period in 2014.

38.     In the press release announcing the results, Donatelli stated:

---

service for the entirety of the periods presented).  Same-Property NOI is a primary performance measure used by the Company to assess the results of operations at its properties.

> During the third quarter, we made significant progress on our strategic initiatives, delivered a solid quarter from an operating perspective, and continued to actively manage our portfolio and balance sheet. We increased our occupancy to nearly 90%, delivered positive net absorption, and had strong same property NOI growth on both a GAAP and cash basis.

39.     In the October 30, 2015 earnings call, Donatelli further stated: "We are pleased to report a strong third quarter from both an operating and financial perspective. We made solid progress on the strategic initiatives that we've outlined last quarter, increased our occupancy, delivered strong same-property growth, and had positive net absorption." He continued:

> We also increased our same-property NOI by 3.1% on an accrual basis, bringing our same-property NOI growth to 4% for the first year and delivered 32,000 square feet of positive net absorption during the quarter.

> Overall, I am very pleased with our efforts this quarter and the positive results they've generated. Encouraged by the solid performance, as well as our momentum going into the fourth quarter, we increased our 2015 core FFO guidance.

40.     In November 2015, the Company undertook a leadership transition. On November 8, 2015, Donatelli resigned. Defendant Milkovich replaced him. The Board appointed Milkovich as the Company's new President and CEO, and granted him an award of 150,000 restricted common shares, scheduled to vest in one-quarter increments on the second through fifth anniversaries of the date of the grant (January 13, 2016). Milkovich also joined the Board as a trustee.

41.     According to the Proxy:

> In connection with this leadership transition and at the direction of the Board . . . , the Company's management team, with input from outside advisors, conducted a thorough review of the Company's business, portfolio and property-level operations over the next few months and formulated a strategic business plan for the Company, with a view toward enhancing shareholder value. During this period, the Company's management regularly updated the [Board] trustees on the status of these efforts.

42.     According to the Proxy:

- 10 -

Several times in February 2016, the Company's trustees and management held formal and informal meetings to discuss the draft strategic business plan for the Company prepared by management.  During the course of these meetings, the Company's trustees and management engaged in discussions regarding, among other things, the Washington, D.C. office market, ***property-level valuations***, balance sheet initiatives, the Company's dividend policy, potential asset dispositions, potential redevelopment opportunities and various strategic initiatives in connection with each of the foregoing.  After an extensive review of, and discussions regarding, the business and the portfolio, the Board of Trustees authorized the Company's management team to present the [Strategic Plan (defined and discussed below)] to investors . . . .

43.     On February 22, 2016, the Company filed its Annual Report for the fiscal year ended December 31, 2015 on a Form 10-K.  In the Form 10-K, the Company stated that it acquired the following three properties:

- an office property in Washington D.C. at a 6.2% cap rate;[2]

- an office property in Northern Virginia at a 6.9% cap rate; and

- an office property in Washington D.C. at a 5.3% cap rate.

44.     The Company also stated that it disposed of the following nine properties, according to the Company's plan to divest itself of "lower-quality" assets:

- an office property in Northern Virginia at a 8.6% cap rate;[3]

- a business park in Northern Virginia at a 6.0% cap rate;

- a business park in Maryland at a 8.3% cap rate;

- a business park in Southern Virginia at a 9.0% cap rate;

- a business park in Maryland at a 4.4% cap rate;

---

[2]   Cap rates for acquisitions is calculated based on the annual anticipated net operating income divided by the purchase price.

[3]   Cap rates for dispositions are calculated based on the annualized net operating income, which is based on the year-to-date net operating income through the month prior to the sale, divided by the selling price.

- a business park in Northern Virginia at a 7.0% cap rate;

- an office property in Maryland at a 8.1% cap rate;

- an office property in Maryland at a 6.9% cap rate; and

- a business park and office property in Maryland at a 8.4% cap rate.

45. The following chart summarizes the acquisitions and dispositions:

**Property Acquisitions and Dispositions**

We did not acquire any properties in 2015. We acquired three properties in 2014. Below is a summary of our dispositions during 2015 and our acquisitions and dispositions during 2014 (in thousands, except square feet and percentages).

| Acquisitions | Reporting Segment | Acquisition Date | Property Type | Square Feet | Purchase Price | Capitalization Rate[1] |
|---|---|---|---|---|---|---|
| 11 Dupont Circle, NW | Washington, D.C. | 9/24/2014 | Office | 155,713 | $ 89,000 | 6.2% |
| 1775 Wiehle Avenue | Northern Virginia | 6/25/2014 | Office | 130,048 | 41,000 | 6.9% |
| 1401 K Street, NW | Washington, D.C. | 4/8/2014 | Office | 117,243 | 58,000 | 5.3% |

| Dispositions | Reporting Segment | Disposition Date | Property Type | Square Feet | Net Sale Proceeds | Gain on Sale | Capitalization Rate[2] |
|---|---|---|---|---|---|---|---|
| Cedar Hill I and III | Northern Virginia | 12/28/2015 | Office | 102,632 | $ 25,939 | $ 6,598 | 8.6% |
| Nevington Business Park Center | Northern Virginia | 12/21/2015 | Business Park | 255,600 | 31,409 | 19,495 | 6.0% |
| Rumsey Center | Maryland | 7/28/2015 | Business Park | 135,015 | 14,956 | 3,384 | 8.3% |
| Richmond Portfolio[3] | Southern Virginia | 3/19/2015 | Business Park | 828 | 53,768 | 857 | 9.0% |
| Owings Mills Business Park | Maryland | 10/16/2014 | Business Park | 180,475 | 12,417 | — | 4.4% |
| Corporate Campus at Ashburn Center | Northern Virginia | 6/26/2014 | Business Park | 194,184 | 39,910 | 21,230 | 7.0% |
| Patrick Center[3] | Maryland | 4/16/2014 | Office | 66,269 | 10,888 | 1,338 | 8.1% |
| West Park[3] | Maryland | 4/2/2014 | Office | 28,333 | 2,871 | — | 6.9% |
| Girard Business Center and Gateway Center[3] | Maryland | 1/29/2014 | Business Park and Office | 341,973 | 31,616 | — | 8.4% |

[1] Capitalization rates for acquisitions are calculated based on the annual anticipated net operating income divided by the purchase price.
[2] Capitalization rates for dispositions are calculated based on the annualized net operating income, which is based on the year-to-date net operating income through the month prior to the sale, divided by the selling price. Due to the timing of the sale of the Girard Business Center and Gateway Center in January 2014, the capitalization rate for the sale was based on the net operating income for 2013 divided by the selling price.
[3] The operating results of these properties, including any gains on sale or impairments, are reflected in "(Loss) income from discontinued operations" in our statement of operations. See further discussion at note 9, *Dispositions*.

46. In the Form 10-K, the Company also announced that it was implementing a strategic plan ("Strategic Plan") to "de-risk the portfolio, de-lever the balance sheet and maximize asset values." The Company stated that the key action items for the Strategic Plan included the following:

- "Improve our portfolio composition by increasing the disposition of non-core assets from $200 million to approximately $350 million.

- Address upcoming lease expirations through the repositioning of 500 First Street, NW and 540 Gaither Road at Redland Corporate Center, and the future sale of One Fair Oaks.

- Strengthen the balance sheet and improve liquidity by reducing leverage, limiting our floating rate debt exposure over time, and extending our debt maturities to better match our capital structure with our assets.

- Manage our cost structure by reducing normalized corporate overhead and general and administrative expenses.

- Reduce our targeted annualized common share dividend from $0.60 to $0.40."

47.     At the February 12, 2016 Fourth Quarter 2015 earnings call, Milkovich stated:

I am please to report core FFO of $0.28 per share, bringing our core FFO for 2015 to $1.02. We delivered strong same property GAAP NOI growth during the quarter and for the full year at 6.1% and 4.8% respectively. We also had a solid leasing year this quarter signing 104,000 square feet of new leases and 186,000 square feet of renewal leases, increasing our occupancy to 90.3% and our lease percentage to 92.1%. Year-over-year, our occupancy increased 240 basis point and our lease percentage increased 80 basis points. At 90.3%, we are currently the highest occupancy level we've seen since the second quarter of 2005.

48.     Milkovich also stated, with respect to the Strategic Plan – "I believe the plan we've outlined maximizes value for shareholders and we have the team in place to execute effectively."

49.     On April 28, 2016, the Company reported results for the three months ended March 31, 2016, including increased Same Property NOI by 7.9% on an accrual basis and 10.2% on a cash basis compared with the same period in 2015.

50.     In the press release announcing the results, Milkovich stated: "During the first quarter, we continued to make progress on our Strategic Plan to improve performance and enhance shareholder value."  He further stated:

We improved both our leased and occupied percentages, delivered very strong same-property NOI growth, continued to execute on the sale of non-core assets, and utilized the proceeds from asset sales to redeem 5.8 million of our 7.750% Series A Preferred Shares.  We remain confident in our strategic plan to de-risk and de-lever First Potomac, and will continue to position ourselves to benefit from an improving Washington, D.C. office market over the longer term.

51.     At the April 29, 2016 First Quarter 2016 Earnings Conference Call, Milkovich stated: "In the first quarter of 2016 we further improved our operating metrics increasing both our leased and occupied percentages, delivered strong same property NOI growth, and continue to execute on

the sale of the non-core assets."  He further stated: "We also continue to make progress on our strategic plan and improve the performance and enhance shareholder value . . . .  Starting with our operating results for the first quarter, I am pleased to report core FFO of $0.24 per share and strong same property GAAP NOI growth of 7.9%, as a result of occupancy increases across our portfolio."

52.     On July 28, 2016, the Company reported results for the three and six months ended June 30, 2016, including increased same property net operating income by 3.6% on an accrual basis and 6.0% on a cash basis compared with the same period in 2015.

53.     In the press release announcing the results, Milkovich stated: "We had a very strong second quarter from both a financial and operational perspective as we continued to execute on our strategic plan to de-risk, de-lever, and maximize shareholder value . . . ."  He continued:

> We signed 293,000 square feet of leases, achieved a tenant retention rate of 90% for the quarter, delivered solid same-property NOI growth of 3.6% and continued to improve our operating metrics.  Subsequent to the end of the quarter, we fully redeemed the remaining 7.750% Series A Preferred Shares and closed on the sale of Storey Park, bringing our total dispositions to over $200 million against our stated goal of $350 million.  We are pleased with the progress we have made, and we remain focused on optimizing our portfolio and unlocking the value that is inherent in First Potomac.

54.     At the July 25, 2016 earnings conference call, Milkovich stated:

> We are pleased to report a strong completion of the first half of 2016 as we continue to make progress against the strategic plan that we outlined earlier this year.  During the second quarter, we delivered strong leasing results, created positive net absorption, same property NOI growth and made further improvements to our leased and occupied percentages.  We also continued executing on the sale of the non-core assets and fully redeemed our Series A preferred shares following the close of the second quarter.

55.     Milkovich further stated:

> Based on our solid progress and market outlook, we increased our full year core FFO guidance . . . .  I am pleased to report core FFO of $0.27 per share along with same property GAAP NOI growth of 3.6%, as a result of occupancy increases in

Washington DC, Maryland, and Southern Virginia.  This brings our same property GAAP NOI growth to 5.7% for the first half of the year.

56.     On October 27, 2016, the Company reported results for the three and nine months ended September 30, 2016, including increased Same Property NOI by 4.1% on an accrual basis compared with the same period in 2015.

57.     In the press release announcing the results, Milkovich stated:

We are pleased to announce our fourth consecutive quarter of strong operational and financial results, as we continue to execute on our strategic plan to de-risk our portfolio, de-lever our balance sheet, and create value for our shareholders.  In the third quarter, we delivered strong same property growth, increased our leased and occupied percentages year-over-year, and continued to make progress on dispositions.  We have made significant strides towards achieving our stated goals and believe that we are well positioned to continue delivering value for First Potomac shareholders.

58.     At the October 28, 2016 earnings conference call, Milkovich stated:

We're pleased to report strong third quarter results, which demonstrates the progress we continue to make on initiatives we laid out earlier this year.  We delivered strong operational results for the quarter, increased both our leased and occupied percentages year-over-year, achieved strong Same Property NOI growth, and continued executing on the sale of non-core assets, and fully redeemed our Series A Preferred Shares.

59.     He further stated:

        I am pleased to report Core FFO of $0.28 per share along with Same Property NOI growth of 4.1% for the third quarter as a result of occupancy increases in Southern Virginia, Maryland, and Washington DC.  This brings our Same Property NOI growth to 5.1% for the year.  We signed 74,000 square feet of new leases and 206,000 square feet of renewal leases increasing our lease percentage to 94.1% and our occupancy to 92.8%.

60.     On February 23, 2017, the Company reported results for the three and twelve months ended December 31, 2016, including increased Same Property NOI by 2.4% on an accrual basis compared with the same period in 2015.

61.     In the press release announcing the results, Milkovich stated:

A year ago we announced our strategic plan to de-risk our portfolio, de-lever our balance sheet and maximize value for our shareholders, and I am pleased with the progress we have made to date.  While there was an intense focus on executing the Strategic Plan, we were also able to deliver very strong operational and financial results in 2016.  As we look forward, we know there is plenty of work to be done in 2017, including completing our targeted non-core asset dispositions and executing on our redevelopment projects, but we are prepared for those objectives and look forward to continuing to deliver value for our shareholders.

62.     On February 24, 2017, the Company filed its Annual Report for the fiscal year ended December 31, 2016 on a Form 10-K.  In the Form 10-K, the Company stated that it disposed of the following two properties in 2016, according to the Company's plan to divest itself of low-quality, "non-core" assets:

- land in Washington D.C.;[4] and

- various property in Northern Virginia at a 8.7% cap rate.[5]

63.     The Company stated that as of the date of the filing, the Company had sold "$294.6 million of non-core assets toward our previously stated goal of $350 million."

64.     At the February 24, 2017 Fourth Quarter and Year End 2016 Earnings Conference Call, Milkovich stated:

- "We began 2016 with the announcement of our strategic business plan.  The major tenants of the plan are to de-risk the portfolio, de-lever the balance sheet and maximize shareholder value.  We had a productive year and the progress we're making against the plan has been substantial."

---

[4]     This property did not generate any revenues, so a cap rate for the property is not applicable.

[5]     Cap rates for dispositions are calculated based on the annualized net operating income, which is based on the annualized year-to-date net operating income through the month prior to the sale, divided by the selling price.

- "Let me quickly highlight our accomplishments.  We have successfully sold $295 million against our goal of $350 million of asset sales."

- "Core FFO for the fourth quarter was $0.27 per share, bringing our Core FFO for 2016 to $1.06 per share and that was at the high-end of the range of our guidance that we provided.  We delivered positive 2.4% Same Property NOI growth for the full year, despite the impact of a $1.8 million of NOI write-offs associated with the single tenant in DC."

65.     On March 21, 2017, two former trustees (Richard B. Chess and Alan G. Merten) informed the Board that they intend to retire from the Board, upon expiration of their current terms as trustees, which was set to expire at the upcoming 2017 annual meeting of shareholders.

66.     On April 27, 2017, the Company reported results for the three months ended March 31, 2017, including increased Same Property NOI by 1.2% on an accrual basis compared with the same period in 2016.

67.     In the press release announcing the results, Milkovich stated:

With over $100 million of additional non-core asset sales completed during the first quarter, we have largely achieved the disposition goals we announced in February 2016.  In addition, with One Fair Oaks sold, 540 Gaither in active redevelopment with two floors already pre-leased and the potential for a short-term extension with the Bureau of Prisons at 500 First Street, we have addressed our major lease expirations and significantly reduced the risk of our portfolio.  As we move forward in 2017, we will have a stronger portfolio and a more flexible capital structure to drive growth and to maximize shareholder value.

68.     At the April 28, 2017 earnings conference call, Milkovich stated:

- "We are pleased with our first quarter results which were above our expectations and generated by continued performance in our portfolio, additional asset sales and further debt reductions."

- "Core FFO for the first quarter was $0.23 per share.  Same property NOI growth was positive at 1.2%, largely driven by improved occupancy in our higher rent office assets, including 440 First Street and 1401 K Street."

**The Sales Process**

69.     While FPO continued to successfully execute its Strategic Plan, solidifying the long-term value of the Company, the Board agreed to explore a potential sale of the Company in or around February 2017.

70.     On February 21, 2017, the Board held a meeting.  It is reasonably inferred that all Individual Defendants (Arnold, Hoffman, Penney, Robinson, and Stevens) attended the meeting – the Proxy does not state that any Board member was absent.  At this meeting, the Board authorized engaging Wells Fargo as the Company's financial advisor.  The Board agreed that the Company's management and Wells Fargo should contact potential investors to discuss their interest in a potential strategic transaction with the Company.

71.     Between May 10 and May 12, 2017, the Company received four written indications of interest: (i) Party A proposed an acquisition at $11.00 to $11.25 per share; (ii) Party B proposed an acquisition at $11.00 per share; (iii) GOV proposed an acquisition at $11.00 per share; and (iv) another party, unnamed in the Proxy, proposed an acquisition at $10.00 per share.  Six other companies orally indicated interest.

72.     On May 22, 2017, the Company sent a process letter to Party A, Party B and GOV, requesting definitive proposals by June 13, 2017.

73.     On June 13, 2017, Party B submitted a written proposal for an acquisition at $11.15 per share.

74.     Also on June 13, 2017, GOV submitted a written proposal for an acquisition at $11.00 per share.

75.     With respect to Party A, Party A was a serious bidder, who had demonstrated interest in acquiring the Company since at least October 2016, when it had submitted an written indication of interest to acquire the Company at $11.00 to $12.00 per share.  Party A requested from the Company additional time to put together its written proposal, and sent the Company a letter indicating that Party A believed it would be prepared to send a proposal by June 30, 2017.

76.     On June 16, 2017, the Board held a meeting.  It is reasonably inferred that all Individual Defendants (Arnold, Hoffman, Penney, Robinson, and Stevens) attended the meeting – the Proxy does not state that any Board member was absent.  At this meeting, according to the Proxy, the Board agreed to favor GOV over Party B because of the "greater execution risk" presented by Party B's proposed termination and financing terms.  The Board directed Morgan Stanley to go back to GOV and communicate the need for a higher price.  The Board also directed Morgan Stanley to go back to Party B to encourage Party B to provide a mark-up of the draft merger agreement.  The Proxy does not state that the Board directed Morgan Stanley (or anyone else) to negotiate the "execution risk" items with Party B.  It is reasonably inferred that the Board failed to do so.

77.     On June 20, 2017, GOV submitted a written proposal for an acquisition at $11.15 per share, attaching an exclusivity agreement to be signed by June 22, 2017, and providing for exclusivity until July 1, 2017.

78.     On June 20, 2017, Party B orally communicated that it would be willing to increase its purchase price up to $11.25 per share.  Wells Fargo requested clarification as to whether Party B was proposing a reverse termination fee construct in lieu of full specific performance; Party B confirmed that it was, with the price to be determined.

79.     On June 21, 2017, the Board held a meeting.  It is reasonably inferred that all Individual Defendants (Arnold, Hoffman, Penney, Robinson, and Stevens) attended the meeting – the Proxy does not state that any Board member was absent.  At this meeting, the Board voted unanimously to authorize the Company to enter exclusive negotiations with GOV.  The Proxy does not state that the Board attempted to re-engage Party A before agreeing to exclusivity with GOV.  It is reasonably inferred that the Board failed to do so.

80.     Later than same day, on June 21, 2017, Party B submitted a written proposal at $11.25 per share, with a reverse termination fee of $40 million.

81.     The Board did not meet to consider Party B's written proposal.  According to the Proxy, at the Board meeting in the morning, the Board agreed that no further meeting was necessary if Party B submitted a revised offer that was consistent with its oral offer.

82.     FPO's management promptly executed an exclusivity agreement with GOV, and commenced negotiation of merger agreement and related transaction documents.

83.     On June 25, 2017, Party B submitted a written proposal at $11.40 per share.  The Company's management forwarded Party B's proposal to all Board members.

84.     Later than afternoon, on June 25, 2017, the Board held a meeting.  It is reasonably inferred that all Individual Defendants (Arnold, Hoffman, Penney, Robinson, and Stevens) attended the meeting – the Proxy does not state that any Board member was absent.  At this meeting, Wells Fargo reviewed its financial analysis of the $11.15 Merger per share price with the Board.  Wells Fargo rendered to the Board its opinion that, "based on and subject to various assumptions made, procedures followed, matters considered and limitations and qualifications described in its opinion,"

the $11.15 Merger per share price consideration was fair, from a financial point of view, to the Company's common stockholders.

85.     Relying on the fairness opinion, the Board unanimously approved the Merger Agreement and determined to recommend the Merger to the Company's stockholders.

86.     Despite the presence of Party B's higher-priced bid on the table, and without checking whether Party A was willing to submit a higher priced offer, the Board agreed to include preclusive terms in the Merger Agreement to ensure that GOV would not lose its favored position. Among other things, the Merger Agreement included a termination fee of $25 million. To put the number in context, Party B's $11.40 per share offer represented (assuming 58,740,535 outstanding shares) $14.7 million more than GOV's offer. However, in order to ensure an acquisition at that price, Party B had to be willing to pay an additional $25 million on top, representing a 170% increase from what Party B was originally willing to pay over GOV's offer.

87.     On June 27, 2017, FPO announced the Merger Agreement.

**The Inadequate Consideration for Stockholders, Material Benefits for Defendants**

88.     The $11.15 per share Merger consideration significantly undervalues FPO. When Milkovich took the helm of the Company in November 2015, the Company's stock price was at $11.60 per share. The $11.15 per share Merger price contradicts the Company's recent performance and is inconsistent with management's stated expectations of future value. As discussed above, all signs pointed to growth. The Company was consistently reporting strong same-property NOI growth. The Company had successfully executed most of its Strategic Plan and recently pruned off lower quality assets to eliminate their drag-down. Sales were up sharply during the first quarter of 2017 versus the previous year's first quarter. During the first quarter of 2017, sales at FPO totaled

$80.62 million.  This is an increase of 94.1% from the $41.54 million in sales at the company during the first quarter of 2016. This was the biggest same quarter rise in sales at FPO in the previous 34 quarters.

89.     The $11.15 per share Merger price is below the Company's June 27, 2017 closing price of $11.35 per share, lower than the $11.40 offer from Party B, and below analyst consensus NAV of $11.37 per share.

90.     While stockholders are being encouraged to cash out at an unfair price, defendants stand to secure material benefits in connection with the Merger.

91.     Each outstanding restricted share (including unvested shares and shares subject to performance conditions that have not been satisfied) and restricted shares to be issued (subject to performance conditions that have not been satisfied) will vest and be immediately cashed in connection with the Merger.  The following table summarizes the consideration the Individual Defendants may secure in connection with the Merger:

| Executive Officer / Trustee: | No. of Company Restricted Shares Held (#) | No. of Company Restricted Shares To be Issued (#)(1) | Dividends ($)(2) | | Resulting Consideration ($) | |
|---|---|---|---|---|---|---|
| Robert Milkovich | 371,866 | 132,186 | $ | 47,248 | $ | 5,667,428 |
| Andrew P. Blocher | 216,447 | 75,650 | $ | 28,389 | $ | 3,285,271 |
| Samantha S. Gallagher | 193,928 | 70,148 | $ | 26,325 | $ | 2,970,772 |
| James P. Hoffmann | 5,018 | — | $ | — | $ | 55,951 |
| Terry L. Stevens | 5,018 | — | $ | — | $ | 55,951 |
| Alan G. Merten(3) | — | — | $ | — | $ | — |
| Richard B. Chess(3) | — | — | $ | — | $ | — |
| Robert H. Arnold | 5,018 | — | $ | — | $ | 55,951 |
| Thomas E. Robinson | 5,018 | — | $ | — | $ | 55,951 |
| Kati M. Penney | 5,018 | — | $ | — | $ | 55,951 |

(1)  Represents (i) Company Restricted Shares issuable to such persons for performance in excess of "target" level and (ii) Company Restricted Shares issuable upon conversion of the Look-Back LTI Award.

(2)  Represents distributions payable with respect to performance-based Company Restricted Shares that become vested in connection with the mergers.

(3)  Richard B. Chess and Alan G. Merten retired from our Board of Trustees upon the expiration of their terms on
     May 23, 2017. These former trustees do not own any Company Restricted Shares.

92.     Moreover, defendant Milkovich (and other executive officers) will secure millions in

golden parachute compensation:

**Golden Parachute Compensation**

| Named Executive Officer | Cash ($) | Equity ($) | Benefits ($) | Total ($) |
|---|---|---|---|---|
| Robert Milkovich | $3,546,000 | $5,620,180 | $  — | $9,166,180 |
| Andrew P. Blocher | $2,568,753 | $3,256,882 | $  — | $5,825,635 |
| Samantha S. Gallagher | $2,214,209 | $2,944,447 | $  — | $ 5,158,65 |

93.     With respect to Wells Fargo, Wells Fargo expects to receive approximately $9 million

for its services, of which approximately $8 million is contingent on the completion of the Merger.

94.     Wells Fargo also stands to strengthen its business relationship with GOV.  In the two

years preceding the Wells Fargo fairness opinion for the Merger, "Wells Fargo Securities received

for investment banking services aggregate fees of approximately $370,000 from the Company and/or

certain of its affiliates" and, in comparison, "approximately $10 million from GOV" and its

affiliates.

**The Misleading Proxy**

95.     On August 24, 2017, defendants filed and disseminated the Proxy to the Company's

shareholders, recommending that FPO shareholders vote in favor of the Merger at the special

meeting of shareholders on September 26, 2017.

96.     In the Proxy, defendants stated several times that the Merger is "advisable and in the

best interests of" FPO shareholders."  *See* Proxy at 4, 29, 42, 45.

97.     In the Proxy, defendants stated that prior to their decision to recommend the Merger,

the Board received Wells Fargo's financial analysis regarding the Merger consideration and Wells

Fargo's opinion "based on and subject to various assumptions made, procedures followed, matters

- 23 -

considered and limitations and qualifications on the review undertaken stated in its opinion, the consideration to be received in the . . . Merger" is fair, from a financial point of view, to the Company's common stockholders. *See* Proxy at 42, 45.

98.     In the Proxy, defendants stated that, in arriving at its opinion, Wells Fargo "analyzed the estimated net asset value of the Company's real estate portfolio and other assets based upon the financial forecasts and estimates referred to above and assumptions relating thereto discussed with and confirmed as reasonable by the Company's management." *See* Proxy at 46.

99.     In the Proxy, defendants listed Wells Fargo's fairness opinion as a "material" factor supporting the Board's decision to recommend the Merger. *See* Proxy at 42-44.

100.     In the Proxy, defendants stated the following (and only the following) concerning Wells Fargo's NAV analysis:

> ***Net Asset Value Analysis***.  Wells Fargo Securities performed a net asset value analysis of the Company based on the Company's balance sheet data as of March 31, 2017 and other information and data provided by the Company's management. An estimated aggregate net asset value reference range for the Company was calculated based on the net operating income of, and capital costs related to, the Company's assets as provided by the Company's management utilizing an approximately ten-year projected period and ***market and submarket specific capitalization rates on an asset-by-asset basis*** taking into account, among other factors, the asset quality, tenant roster, portfolio location, current occupancy levels and lease maturity profiles of such assets. For purposes of its net asset value analysis, Wells Fargo Securities also took into account, based on the Company's balance sheet as of March 31, 2017 and other information and data provided by the Company's management, (i) the estimated market value of certain land owned by the Company and the total estimated value of the Company's cash, cash equivalents and other non-realestate assets as of March 31, 2017 and (ii) the total estimated amount of the Company's liabilities as of March 31, 2017, with total estimated debt marked to market as of May 31, 2017.  This analysis indicated the following approximate implied equity value per share reference range for the Company, as compared to the consideration to be received in the REIT Merger:

| Implied Equity Value | REIT Merger Consideration |
| --- | --- |

| Per Share Reference Range | |
|---|---|
| $10.55 - $11.44 | $11.15 |

*See* Proxy at 49.

101.    In the context of the above, defendants omitted the "market and submarket specific capitalization rates on an asset-by-asset basis" ("Asset-by-Asset Cap Rates") used in Wells Fargo's NAV analysis.

102.    The omitted information is material for several reasons.

103.    First, there is no information more material to shareholders in a cash-out merger than the information underlying or supporting the purported "fair value" of their shares, like a banker's valuation.  Defendants themselves admit that a "material" factor underlying their recommendation of the Merger was the valuation performed by Wells Fargo.

104.    Second, for REITs, like FPO, the most valuation metric and benchmark valuation method is NAV.  The value of a REIT is primarily a function of the value of its underlying real estate, and NAV values a REIT based on the actual market value of its underlying real estate. Traditional valuation methods such as book value often fail to accurately measure the value of a REIT's underlying real estate because they do not account for the fact that real estate generally appreciates over time or maintains residual value to a much greater extent than other depreciable assets.

105.    Third, in NAV, the choice of cap rates is the most important input in the model.  The higher the cap rate, the lower the valuation that is being assigned to the real estate.

106.    Here, the Proxy omits the cap rates used in Wells Fargo's NAV analysis – the Asset-by-Asset Cap Rates.  Omitting these key assumptions, the Proxy leaves Company shareholders only

with the threadbare bottom-line conclusion of Wells Fargo's NAV analysis, which is far from being a "fair summary" of that analysis.

107.     Fourth, on the basis of the $11.15 per share Merger price, GOV and analysts following FPO estimate that the Merger reflects approximately an implied 7% cap rate.[6]

108.     A 7% cap rate is high and outside the range of reasonableness for the Company.

109.     As recognized by analysts, however, the Company's peers capitalization rates are around 6%.  According to a Lazard Global Real Estate Securities report in July 2017, capitalization rates for commercial real estate transactions in 2017 are holding in the 6.2%-6.3% range.

110.     In the last three acquisitions, the Company acquired office properties at a 5.3%, 6.2% and 6.9% cap rate.

111.     Moreover, as discussed above, the Company has successfully executed a plan over a couple of years to divest itself of "low quality" and non-core properties.  These properties were disposed at a higher capitalization rate generally in the 7-9% range (*see* ¶¶44-45, 62), suggesting that the properties the Company choose to ***keep*** were assumed a capitalization rate under that range.

112.     A difference of 1% in capitalization rate is significant to the conclusion of value.  By way of simple example, assuming NOI of $100 million, a cap rate of 6% equals NAV of $1.7 billion; a cap rate of 7% equals NAV of $1.4 billion – a difference of $300 million.

113.     The disclosure of the Asset-by-Asset Cap Rates is necessary to obtain visibility into the underlying cap rates that resulted in a range that supported the fairness of a deal at an implied 7%

---

[6]     Wells Fargo applied a range of exit capitalization rates of 7.40% to 7.60% in its DCF analysis, but the Proxy does not indicate whether or not these same rates were used in the NAV analysis (and if not, the reasons for using different rates for the two analyses).  These compound the other disclosure issues with the DCF analysis, including the omission of unlevered free cash flow and dividends payable, the key projections underlying the DCF analysis.

cap rate.  The Merger consideration does not adequately reflect the true value of the Company's stock (*see* 88-89).

114.    The disclosure of the Asset-by-Asset Cap Rates is necessary to discern that Wells Fargo and the Company's management used unreasonably high cap rates and/or that there are certain assets with high cap rates that is pulling the overall cap rate unreasonably high – in either case, resulting in an artificially depressed valuation of the Company.  With respect to the latter, the Company has not yet completed divesting its non-core properties, meaning that there are most likely high cap rate properties, which fact is concealed by the omission of the Asset-by-Asset Cap Rates.

115.    This omission of the Asset-by-Asset Cap Rates rendered the following specific statements in the Proxy misleading:

- the statements of opinion that the Merger is "advisable and in the best interests of" FPO shareholders"  (Proxy at 4, 29, 42, 45) ;

- the qualitative statements representing the reasonableness of the assumptions underlying the NAV analysis (Proxy at 46);

- the text concerning Wells Fargo's NAV analyses (Proxy at 49); and

- statement suggesting that a valid valuation of the Company's stock resulted in a valuation in a range of $10.55 – $11.44 per share (Proxy at 49).

116.    Without the omitted information, the above statements created the misleading impression that the Board's recommendation was based on valid valuation – Wells Fargo's NAV analyses – that used reasonable assumptions.  As discussed above, to the contrary, Wells Fargo's NAV analyses reflected an unreasonably high cap rate, and resulted in an artificially lowered valuation of the Company.

117.    Had the Asset-by-Asset Cap Rates been disclosed, the Company's stockholders would be able to appreciate the flaws in Wells Fargo's analysis, and would be inclined to reject Wells Fargo's fairness opinion and the Board's recommendation of the Merger.

118.    By omitting the unreasonable Cap Rates, defendants induced Company's stockholders to accept Wells Fargo's fairness opinion, the Board's recommendation of the Merger, and give up their shares for the inadequate Merger consideration.

119.    By misleading shareholders as to the true value of their stock, defendants are preventing the Company's shareholders from making a fully informed decision on the Merger and are inducing the Company's shareholders into accepting an offer that was unfair compared to the actual intrinsic value of the Company.

120.    As a consequence, plaintiff and the Class are being harmed.

## COUNT I

### For Violations of §14(a) of the 1934 Act and Rule 14a-9
### Promulgated Thereunder Against the Individual Defendants and FPO

121.    Plaintiff repeats and realleges each allegation set forth herein.

122.    The Individual Defendants and FPO prepared, reviewed, and/or disseminated the false and misleading Proxy which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

123.    In so doing, the Individual Defendants and FPO omitted to state material facts necessary to make the statements made not misleading in violation of §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.  By virtue of their positions within the Company, the Individual Defendants and FPO were aware of this information and of their duty to disclose this information in the Proxy.

124. The Individual Defendants and FPO were at least negligent in filing the Proxy with these materially false and misleading statements.

125. As a direct result of defendants' negligent preparation, review, and dissemination of the false and/or misleading Proxy, plaintiff and the class are being induced to vote their shares and accept the inadequate consideration of $11.15 per share in connection with the Acquisition. The false and/or misleading Proxy used to obtain shareholder approval of the Acquisition is depriving plaintiff and the class of their right to a fully informed shareholder vote in connection therewith and the full and fair value for their FPO shares. At all times relevant to the dissemination of the materially false and/or misleading Proxy, defendants were aware of and/or had access to the true facts concerning FPO's true value, which was far greater than the $11.50 per share offered in the Merger. Thus, as a direct and proximate result of the dissemination of the false and/or misleading Proxy defendants are obtaining shareholder approval of and thereby consummating the Acquisition, harming plaintiff and the Class and causing them actual economic losses (*i.e.*, the difference between the price FPO shareholders receive in the Merger versus FPO's true value at the time of the Acquisition) in an amount to be determined at trial.

126. The omissions and misleading statements in the Proxy were material in that a reasonable shareholder would consider them important in deciding how to vote on an acquisition. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in a proxy and in other information reasonably available to shareholders. The misleading Proxy has the intended effect: causing a materially misinformed vote of the FPO shareholders.

- 29 -

127.    By reason of the foregoing, the Individual Defendants and FPO have violated §14(a) of the 1934 Act and SEC Rule 14a-9(a) promulgated thereunder.

128.    Because of the false and misleading statements in the Proxy, plaintiff and the members of the class have been harmed.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against the Individual Defendants

129.    Plaintiff repeats and realleges each allegation set forth herein.

130.    The Individual Defendants acted as controlling persons of FPO within the meaning of §20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of FPO and participation in and/or awareness of the Company's operations and/or intimate knowledge of the statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.

131.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

132.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The Proxy at issue contains the unanimous recommendation

of each of the Individual Defendants to approve the Acquisition.  They were thus directly involved in the making of this document.

133.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing and approving the Acquisition.  The Proxy purports to describe the various issues and information that they reviewed and considered, descriptions which had input from the Individual Defendants.

134.    By virtue of the foregoing, the Individual Defendants have violated §20(a) of the 1934 Act.

135.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated §14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to §20(a) of the 1934 Act.  As a direct and proximate result of defendants' conduct, FPO shareholders have been harmed.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff demands judgment, in plaintiff's favor and in favor of the Class and against defendants, as follows:

A.    Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.    Declaring that defendants violated the federal securities laws as set forth herein by disseminating and filing the Proxy in connection with the Acquisition, which contain materially false and misleading statements about the Acquisition.

C.      Awarding monetary damages, including rescissory damages, in favor of plaintiff and the Class;

D.      Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

E.      Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  September 25, 2017              SILVERMAN|THOMPSON|SLUTKIN|WHITE
                                       WILLIAM SINCLAIR


                                       _____
                                              /s/ William N. Sinclair
                                       WILLIAM SINCLAIR (Bar No. 28833)

                                       bsinclair@mdattorney.com

                                       201 N. Charles Street, 26th Floor
                                       Baltimore, MD 21201
                                       Telephone:  410/385-2225
                                       410/547-2432 (fax)

                                       ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                       DAVID WISSBROECKER (*Pro Hac Vice*
                                       Motion to Be Filed)
                                       EUN JIN LEE (*Pro Hac Vice* Motion to Be
                                       Filed)
                                       655 West Broadway, Suite 1900
                                       San Diego, CA  92101-8498
                                       Telephone:  619/231-1058
                                       619/231-7423 (fax)
                                       dwissbroecker@rgrdlaw.com
                                       elee@rgrdlaw.com

THE BRISCOE LAW FIRM
WILLIE C. BRISCOE (*Pro Hac Vice* Motion to
Be Filed)
3131 McKinney Avenue, Suite 600
Dallas, TX  75204
Telephone:  214/643-6011
281/254-7789 (fax)
wbriscoe@thebriscoelawfirm.com

*Attorneys for Plaintiff*